Good morning. We'll now proceed to case number four. This is Dan Williams v. the Board of Education of the City of Chicago, case number 19-3152, and we're going to begin with counsel for the appellant, Ms. Baumann. Thank you, Your Honor. Mr. Baumann has spent the past 10 years receiving positive performance evaluations, having no disciplinary record, and he took off to get an advanced degree at Oxford, but there were no problems. Something happened in the 2013-14 school year, and either a combination of his work issues along with depression that he already suffered from, he had to request an appellate. He has the disabilities of depression, anxiety, chronic sinusitis, and there really is no question that these conditions affected his ability to perform the major life activity of working. The record has ample documentation showing that his sleep at night, which in turn made it difficult for him to concentrate on his work tasks, and without some sort of, without an accommodation, and there were three accommodation requests that we're addressing today. The first was October 9th of 2014, and that dealt with the request for an accommodation of a consistent start time. He is a social worker. He was assigned to two schools, but these two schools had different start times, and because of his depression, anxiety, which led to sleep problems, etc., he needed a consistent start time. Again, this was backed up by his doctors. That request was denied by the board. The board believed that this was simply a matter of convenience, and that's what the department referred to it as, a matter of convenience, and they did not go beyond apparently sending a form to the doctor, having the doctor fill it out. They never went back to Mr. Williams to ask additional questions, back to the doctors to get clarification, and it appears that the trial court simply accepted this characterization of what the doctors were saying were legitimate accommodation requests, but basically the board just blew off, lack of a better phrase, disregarded his request and disregarded his limitations. The second accommodation request came in May of 2015. Again, he requested a consistent start time, and in this case he was requesting a reduced caseload, and he was asking to be removed from Prescott. Now, he had talked to the board about the accommodations, and apparently they conveyed something to his principal at Prescott, who started implementing special requirements for him to keep track of records and so forth, which was causing even greater concern to him. He tried to get assistance from the board to no avail, so he wanted to be removed from Prescott. He wanted to be placed at a single school and with a reduced caseload. Now, the court and the board both treated the request for reduced caseload, indicating that he could not legitimately perform the essential functions of his job. That is not the case. The essential functions of his job, and they're articulated in the record, are to counsel students and to help students. There are no mandates that there be a specific number of students that he counsel or that he attend to. There are no mandates that there are a certain number of hours that he has to fulfill and so forth. So it's not a matter of whether or not, you know, he could perform the essential functions of the job. It's whether or not his requests were reasonable, and to determine if the requests are reasonable, it's important to understand, one, what the job is, and two, what the needs of the board were. And that brings up the issue of failing to participate in good faith in the interactive process. Had that occurred, some of these things, some of these misunderstandings, if that's what they were, would not have occurred. But the board did not, in good faith, engage in the interactive process. The requests were made and then denied. He appealed those requests and those were denied. There was no interaction. If the board felt that due to the needs of the board and that they couldn't do a particular accommodation request, they had an obligation to talk to Mr. Williams, talk to Mr. Williams' doctors to see what would be reasonable. And the whole purpose behind this is so that the person is reasonably accommodated with minimal effect on the school. But that didn't happen. The third accommodation request was made in September 7, 2015. And that, again, he requested consistent, I think he, at that point, he had a consistent start time, but he was asking for things that were necessary to his job as a social worker. A desk, a computer, a you know, the court was obviously skeptical. The board was skeptical of those things. But the fact is, again, had they engaged in the interactive process and learned about his depression, learned about his anxiety, what he needed to succeed, what he needed to do to such a major problem. The board did give him some accommodations with respect to the office, and that was really the first time that someone actually came out to the school, talked to the principal, looked at the space. So... What did the board say with respect to the equipment they did not give him? What was their reason for not giving him? Their reason was that it was not related to his disability. And I think that underlies a lot of where the court was coming from, too. Those are assumptions, big assumptions, that they're not related. The doctors very clearly stated that tasks were difficult for someone to accomplish when they're suffering from anxiety and depression, and simple things are much more difficult. So he's got a tough job. He's serving, you know, a number of students who are troubled in a troubled community. He has students who are threatening to kill themselves and do all types of things. So he needs to service those students and not be looking for a place to talk to them, not be searching for a paper and pen and a fax and this and that. And a lot of this stuff, he's required as a social worker to not unusual things. But because he was constantly searching for resources, it caused him a lot of stress. But the court didn't understand that, didn't afford... And the board didn't contact his doctor. So I think, you know, had there been more communication and understanding about depression and about anxiety, this may not have occurred. But to the board, apparently to the court, these were just not important. And I think that underlies this whole case, that this guy is just asking for, special treatment and it's not really the depression, anxiety, etc. He just wants better working conditions. And that's not true. He wants to serve the students in a reasonable manner and in a non-anxiety filled stressful way. So, you know, I mentioned the just a matter of convenience, that right there tells you where the board is coming from. They failed to participate in good faith in the interactive process. They did, in fact, allow other people, and that's in the record, to modify hours and things like that for health reasons. Ms. Bellman, you're into your rebuttal time. Would you like to reserve? I'll reserve two minutes. I'll just finish up. I think that it's really telling that in 2015, 2016, they increased his caseload, even though he had been asking for it to decrease. And then the following year for 2017, 2018, they again increased it by 50%. So, these are things that really should have gone forward. This is not appropriate for summary judgment. Thank you. Thank you, Ms. Bellman. We'll now hear from the appellee, Mr. Doyle. Good morning. May it please the court. The question on summary judgment was whether the plaintiff had presented evidence in support of his claims, whether he met his burden to show that there were viable claims here. I'll start with one of the last pieces that my colleague just mentioned, the notion that the board increased his caseload. As we had argued in our brief or pointed out in our brief, there is no evidence that anyone at the board made a decision to increase Mr. Williams' caseload. There is also no evidence that anyone took any action to increase his caseload. Instead, what happened is his caseload went up when he changed schools. He asked for a school change, we gave him a school change, and at his new school, there was more work. There is not any evidence that this was retaliation or somehow done in bad faith or out of any animus. And it also leads us to another important point. In discussing the argument that she had just made, my colleague mentions that his caseload went up in 2017 and 18, and that brings us to what is the temporal scope for this appeal. The district court judge ruled correctly that the last date that was relevant was the date of his second EEOC charge, which is December of 2015. She also said that any events occurring after that date would have to be like or reasonably related to the items that were included in his December 15 or December 2015 EEOC charge. There is no effort on this record to show that the events were like or reasonably related as to anything that happened after 2015. There were different schools involved, different supervisors involved, and different circumstances involved. The appellant never engages with that legal test, the like or reasonably related, and in the from after 2015 ought to have been considered in the district court. The proper temporal scope is up through 2015. Let me mention one of the points that you had asked about, Judge Ripple, which was the equipment requests that appear as part of the third request for disability accommodations. There was a long laundry list, and we collect what those were in our brief. The answer is not that he was being denied those things. The answer is that he already had them, albeit he had to share some of them with other personnel at Chicago Public Schools. There is no evidence in the record that there was a standalone office with a standalone fax machine and shredder and dedicated phone line that was available for Mr. Williams that he was denied access to. Instead, he had all of the equipment that he needed, albeit to share with other people. In addition, there is no dispute on the record that Mr. Williams had access to private space to meet with students when he had counseling sessions with students. His ability to do his job as a social worker requiring privacy was not in any way impaired by the list of items that he did not get as specific disability accommodation requests on that laundry list of office equipment items that he had asked to have his own dedicated equipment. In that same disability request, we see some of the other things that Mr. Williams had asked for. He asked to be excused from all performance evaluations, saying that those were somehow connected to his disability. He asked to be excused from the residency waiver rules or the residency rules. These items were not shown, as we point out in our brief, were not shown to be connected to his disability, and were not shown to be items that the board unreasonably denied him. Regarding, for example, the performance evaluations, Mr. Williams had a history going back to the 2013-14 school year of having performance evaluations where he rated below proficient. The 2013-14 school year, he had four separate evaluations, and the scores for those are collected on an item that is in the record. The REACH score paper is in the record. He received that REACH score in December of 2014 on the timetable that everyone else did. His score led him to be not within the priority candidates for the items that he was asking for. For example, when he asked for a Saturday or a summer assessment, when he asked for a lead or a fieldwork assignment, his scores were simply too low. Mr. Doyle, who actually does the assessing? Who are the people who give him these scores? The woman who did the 2013-14 and the 2014-15 score is Noemi Ramos. Her affidavit is in ECF 74-2 in the record. Her title in this? She is his based on observations of his work. Ms. Ramos' affidavit also describes some of the uses that the board used for the rating that he received. For example, that his rating meant that he was not a priority candidate for some of the additional assignments that he was looking for. Ms. Ramos, is she a counselor as well or a senior counselor or something? I do not remember. I believe she is in charge of the social workers. I just wondered what her professional standing was. That's all. She was his assigned... That's fine. Don't get off pace. Yes. Her affidavit, and her affidavit will have the answer to that question. I just don't immediately have it at hand. Her affidavit appears at ECF 74-2, pages 47-50. That includes what exactly her professional background was and what she did. Your Honor, my colleague did not discuss in her opening argument, but she did discuss in her brief, her discrimination claim that she had made. One of the points I would like to talk about briefly, if I could, is the standard of causation that applies. It's a but-for standard of causation. In other words, was her disability the but-for cause of the adverse action that she has identified? The proof that Mr. Williams identifies in the record shows nothing like a but-for causation between the adverse actions that he discusses and any connection to his disability. There are other explanations for all of the decisions that were made about his employment, the Saturday summer assignment, the field and lead assignment. Those items were not caused by any discrimination against him because of his disability. There was a time when there may have been some ambiguity in the circuit whether but-for was the correct standard. Since the Monroe versus Indiana said it was but-for, technically that may still be an open question, but this court has recently said that the overwhelming view is that but-for causation is the standard that ought to apply. Your Honor, the appellant also argues at several points in his brief that there is evidence of pretext. There is no evidence of pretext here. There is no evidence that the board was outright lying on any of its explanations for its adverse employment actions. The one piece of evidence that Mr. Williams returns to in his brief and returns to at oral argument here this morning is this phrase, a matter of convenience. The record shows that came up in connection to when Mr. Williams first requested a consistent start time, and that was his disability request that he or his accommodation request that he made in September of 2014. Someone said that to him. There is no indication that that is some smoking gun, that that is some direct evidence of discriminatory animus. It is an innocuous statement. Someone said this would be a matter of convenience. Your Honor, look at what we did, though, is the more important thing. Look at what we did with his request for a consistent start time. We told him there is not another assignment available that would give you the start time that you are requesting. Mr. Williams has no proof that such an assignment existed somewhere else at CPS that would have a different accommodation that was designed to meet the same concern. We told him we have arranged for an arrival time for you that would be steady. In other words, this would let you stabilize your schedule. This would let you get your sleep on a consistent schedule of what you could do. You are still required to be there for the entire time that students are there, and your work day corresponds to the time that students are there. The reason for that, Your Honor, is we need social workers there when the students are there. And across CPS, they are paid according to the time when students are there in learning. So, Your Honor, his complaint in the brief is that we asked him to work without pay for an hour. That's not what we asked. We offered him a way to make his schedule consistent. Later, in May of 2017, when he again asked for a 7.45 a.m. start time, we told him again in May of 2015, there is not an assignment available for you that we can give you immediately. However, we can give you that for the following fall, which is exactly what happened. He was transferred out of Prescott. He was moved to Lawndale and Leland as his assignment for the 2015-16 school year, just as he had requested. That's another important point along the way here, Your Honors. This was not a failure of an interactive process. This was an employee who made many requests for disability accommodations, most of which we granted, some of which we rejected out of hand because we could not do them. For example, we could not eliminate the requirement that he no longer have any evaluation of his work performance. I mentioned that one earlier. But, Your Honor, when we could, we got him a start time he was moving out of Prescott. He asked for a HEPA filter. We got it for him. We made sure that out of the long list of office equipment items that he had access to everything that he needed and that he had private workspace. There is no evidence here that we denied out of hand. And in fact, our brief collects the evidence of how we did engage in the interactive process with him. We emailed. We met. We had phone conversations. There is extensive evidence in the record showing exactly how we discussed what it was that he was looking for and the best way to accomplish what he was looking for. It was one last point, Your Honor. Mr. Williams asked for a lighter caseload. We told him, no, we don't have a lighter caseload assignment available for you. The law in this circuit is clear. As a disability accommodation, we are not required to create a light duty assignment for someone. If one exists and a plaintiff can identify it, it may be something that we would be required to consider. Mr. Williams never identifies that a light duty assignment existed somewhere else at CPS. Your Honor, for all of these reasons, we would ask that this court affirm the district court on summary judgment. The district court was correct to reject the refusal to accommodate when we did not accommodate him. The district court was correct to reject the discrimination claim, and the district court was correct to reject the retaliation claim. Thank you. Thank you, Mr. Doyle. Ms. Baumann, rebuttal. Thank you. It was not just someone in the office who made the comment about the request being a matter of convenience. It was someone in the EOCO office of the Board of Education. Talk about there's no evidence of pretext. Let's look at the 2015-2016 school year. Plaintiff didn't receive any disciplinary action. He was removed from his PDP. Neither of his principals had any performance problems with him, and other people noted in the record notes that he had good job performance, yet he still received a poor performance evaluation. Now, I don't think this court can look at the REACH rubric or the performance evaluation in isolation. He was suffering from these disabilities. He was requesting accommodation so he could fully do his job. The accommodations, many of which were necessary, were not given to him. As a result, his work product, you know, it's not hard to see how this would happen. His work product was not perhaps as good as it should be, but these are interconnected. His requests and their failure to accommodate him are connected with the ultimate REACH evaluations. This matter should go to a jury. The question of their intent, whether they acted in good faith, whether, you know, there was a but-for causation, those are issues of fact, and this case should move forward. Thank you. Thank you, Ms. Baumann. Thank you, Mr. Doyle. The case will be taken to revisement.